# 19MAG2121

Approved: _____

KIERSTEN A. FLETCHER/BENET KEARNEY/ANDREW THOMAS-TKELMAN
Assistant United States Attorneys

Before:    THE HONORABLE KATHARINE H. PARKER
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :       **SEALED COMPLAINT**

     - v. -                       :       Violation of 18 U.S.C.
                                          § 1349
JASON SAGER,                      :
                                          COUNTY OF OFFENSE:
              Defendant.          :       NEW YORK

- - - - - - - - - - - - - - - - - -- x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        CHRISTOPHER BASTOS, being duly sworn, deposes and says
that he is a Detective with the New York City Police Department
and a Task Force Officer with the Department of Homeland
Security - Homeland Security Investigations, and charges as
follows:

                           COUNT ONE
                (Conspiracy to Commit Wire Fraud)

        1.    From at least in or about February 2013 up to and
including at least in or about February 2019, in the Southern
District of New York and elsewhere, JASON SAGER, the defendant,
and others known and unknown, knowingly, did combine, conspire,
confederate, and agree together and with each other to commit
wire fraud, in violation of Title 18, United States Code,
Section 1343.

        2.    It was a part and an object of the conspiracy
that JASON SAGER, the defendant, and others known and unknown,
having devised and intending to devise a scheme and artifice to
defraud and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did transmit and cause to be transmitted by means of wire,
radio, and television communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the

purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge of the foregoing charges are, in
part, as follows:

3.    I am a Detective with the New York City Police
Department ("NYPD") and a Task Force Officer with the Department
of Homeland Security – Homeland Security Investigations ("HSI").
My duties and responsibilities include the investigation of
fraud offenses including wire fraud, bank fraud, and money
laundering.   The information contained in this affidavit is
based upon my personal knowledge and my review of documents and
records gathered during the course of this investigation, as
well as information obtained, directly or indirectly, from other
sources.   Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all of the facts that I have learned during the course
of the investigation.   Where the contents of documents and the
actions, statements, and conversations of others are reported
herein, they are reported in substance and in part, except where
otherwise indicated.

Overview of the Business Opportunity and Debt Relief Schemes

4.    Since 2016, the NYPD and HSI have been
investigating a group of telemarketing companies (the
"Telemarketing Companies") that operate a fraudulent scheme (the
"Business Opportunity Scheme"), described in more detail below.
From my participation in that investigation, I have learned,
among other things, that:

a.    Participants in the Business Opportunity
Scheme induced victims (the "Victims") to make payments through
the false promise and pretense that the Telemarketing Companies
and related entities would establish online businesses on the
Victims' behalf, and that those online businesses would generate
revenue and investment returns for the Victims.

b.    The purported online businesses, ostensibly
but not actually established by the perpetrators of the Business
Opportunity Scheme, and used to induce payment by the Victims,
included businesses said to be online marketplaces and online
merchant processing businesses.   In connection with the sale of
those purported businesses, participants in the Business
Opportunity Scheme would sell "services" purporting to make the

management of those businesses more efficient or profitable, including tax preparation or website design services. At the outset of the Business Opportunity Scheme, a Victim would receive electronic or paper "pamphlets" and so-called "coaching sessions" regarding these purported online businesses, but at no point did the Victims actually earn any of the promised return on their intended investment.

              c.    In the course of investing with the Telemarketing Companies, Victims frequently charged up to tens of thousands of dollars on their personal credit cards in order to fund their investments or make other payments to the Telemarketing Companies.

              d.    After the Telemarketing Companies sold the Victims various services as part of the Business Opportunity Scheme, the Telemarketing Companies effectively refinanced their Victims' participation in the Business Opportunity scheme into a new scheme. The Telemarketing Companies would capitalize on the Business Opportunity Scheme Victims' credit card debts by offering to consolidate or settle the Victims' debt in exchange for an up-front payment to one of the Telemarketing Companies (the "Debt Relief Scheme").

              5.    Based on the NYPD and HSI investigation, and as set forth in greater detail below, JASON SAGER, the defendant, participated in the Business Opportunity Scheme by, among other things, providing other Telemarketing Companies with crucial payment processing and so-called "fulfillment" services through his companies, including WOM Distribution Inc. ("WOM") and Business Development Center ("BDC"). SAGER further participated in the Debt Relief Scheme by purporting to provide debt relief services to Victims through several Telemarketing Companies, including Tax Pilot, Empire Tax and Accounting ("Empire"), and Consumer Shield (together with WOM and BDC, the "Sager Entities").

### SAGER Agrees to Facilitate the Business Opportunity Scheme

              6.    Based on my interviews of more than 100 Victims (the "Victim Interviews") and my participation in this investigation, I have learned, in substance and in part, the following regarding the Business Opportunity Scheme:

              a.    Each Victim was first contacted via phone by a representative of one of the Telemarketing Companies, who offered the Victim an opportunity to earn money by making a cash

investment.  Each Victim was promised the opportunity to earn money through purported marketing websites that would be created for the Victim (in some cases, Victims, who in the course of this scheme tended to be elderly did not own or know how to operate a computer). Each Victim was told that the only step necessary for participating in this purported opportunity was an initial cash investment.

b.    Many Victims, the majority of whom are over 70 years old, invested thousands of dollars with the Telemarketing Companies, typically in the form of (1) a check drawn on the Victim's bank account, or (2) a cash advance against a credit card the Victim opened following the suggestion of the Telemarketing Companies.

c.    After making the initial investment, each of the Victims received repeated phone calls and emails from different Telemarketing Companies offering "coaching" or marketing services, seeking additional investments purportedly to support the Victims' own businesses, tax preparation and business development services, and, eventually, debt relief services.

d.    None of the Victims earned the investment returns they were promised.  When a Victim called to inquire with the Telemarketing Companies regarding promised investment returns, the Victim was directed to managers who either did not answer the Victim's calls; told the Victim to invest more money to secure a return on investment; or promised to follow up with the Victim at a later time, but never did.

7.    Based upon my participation in this investigation, my interviews with multiple cooperating witnesses ("CW-1" and "CW-2")[1], my review of bank records, and my review of documents obtained pursuant to email and premises search warrants, I have learned, among other things, the following:

a.    From in or about 2012 until in or about March 2017, CW-1 operated several Telemarketing Companies based in New Jersey, including Olive Branch Marketing ("Olive Branch"), which participated in the Business Opportunity Scheme

---

[1]    CW-1 and CW-2 have pleaded guilty to fraud and money laundering offenses in connection with the Business Opportunity Scheme and the Debt Relief Scheme.  CW-1 and CW-2 are cooperating with law enforcement in the hopes of receiving leniency at sentencing.

and employed CW-2.    Until late 2015, Olive Branch and other
Telemarketing Companies operated by CW-1 primarily sold Victims
so-called business services in connection with the Victims'
purported online businesses.

            b.    To perpetrate the Business Opportunity
Scheme, the Telemarketing Companies used lists of potential
victims or "leads" (the "Leads").   Many of the Leads who were
called as part of the Business Opportunity Scheme had made an
initial investment to create an online business, as described
above.[2].

            c.    In order to accept credit card payments from
Victims, the Telemarketing Companies used merchant accounts
established at various banks and through various third parties
across the country to process the Victims' payments (the
"Merchant Accounts").   If one of the Merchant Accounts received
a large number of customer claims for a refund, called
"chargebacks," the Merchant Account was shut down.    In addition,
the Telemarketing Companies relied on "fulfillment" companies to
communicate regularly with the Victims and provide the Victims
with pamphlets and other ministerial tangible items – both
designed to prevent chargebacks before they were initiated or
defeat chargebacks if they could not be prevented.

            d.    By mid-2015, CW-1 could not operate a
Merchant Account in CW-1's own name as a result of the high
number of chargebacks for payments processed through CW-1's
Merchant Accounts. As a result, CW-1 – and those working with
CW-1, including CW-2 and a co-conspirator not charged herein
("CC-1") – relied on third party providers of payment processing
services to process Victims' payments, including WOM
Distribution Inc., a company operated by JASON SAGER, the
defendant.[3]   CW-1, CW-2 and CC-1 paid SAGER significant fees for

---

[2]    In addition, many Victims had also been defrauded in a
separate scheme related to fraudulent government grants (the
"Grant Scheme").   Victims of the Grant Scheme were promised that
they would receive a government grant after a period of 90 days
if the Victim paid an application fee of several thousand
dollars with one of the Telemarking Companies.   None of the
Victims of the Grant Scheme ever received such a grant.

[3]    On or about March 21, 2017, HSI served WOM with a grand
jury subpoena for documents connected to companies operated by
CW-1, CW-2 and CC-1.   In response, WOM produced email
communications between JASON SAGER, the defendant, and CW-1,
CW-2 and CC-1 that detailed processing services by SAGER for the

his processing services.[4]  In addition to providing CW-1, CW-2 and CC-1 with Victim payment processing services, SAGER employed a team of people to provide "fulfillment" services through BDC.

<u>SAGER's Orchestration of the Debt Relief Scheme</u>

8.    Based upon my participation in this investigation, my interviews with multiple cooperating witnesses, including CW-1 and a third cooperating witness ("CW-3"), and my review of documents obtained pursuant to email and premises search warrants, I have learned, among other things, the following:

a.    In or about late 2015, Olive Branch no longer had access to "leads," and therefore could not continue the Business Opportunity Scheme.  After discussing this with CW-1, JASON SAGER, the defendant, encouraged CW-1 to start a Telemarketing Company that could to sell debt relief services to the Victims of the Business Opportunity Scheme who had incurred significant credit card debt.  SAGER told CW-1, in sum and substance, that if CW-1's employees sold the so-called debt relief services to Victims, SAGER would provide Merchant Accounts, fulfillment, and customer service to prevent chargebacks.

b.    At that time, CW-1 and SAGER began operating a debt relief Telemarketing Company called "Consumer Shield" and participating in the Debt Relief Scheme.  Pursuant to the arrangement between CW-1 and SAGER, CW-1's sales floor, physically located in New Jersey, sold debt consolidation or debt relief services to Victims, Victims sent payment for these services to one of the Sager Entities, and SAGER was responsible for dealing with customer service and for providing the debt

---

Telemarketing Companies. WOM also produced incorporation documents showing SAGER incorporated WOM in the state of New York in 2011.

[4]    From my participation in this investigation, including my conversations with witnesses familiar with payment processing services, I have learned, among other things, that fees at the rate of those paid to SAGER by CW-1, CW-2, and CC-1 are not typically charged in connection with the establishment of a legitimate merchant account in the name of the actual merchant of that account.

relief services.[5]  As set forth in greater detail below, SAGER did not provide Victims with debt relief, and instead used Consumer Shield and the other Sager Entities to perpetuate the Business Opportunity Scheme through the Debt Relief Scheme, as described above.

       9.    Based upon my interview with a Victim ("Victim-1") and my review of documents provided by Victim-1, I have learned, among other things, the following:

       a.    Victim-1, then living in the state of Illinois, was contacted via phone in early 2017 by a representative ("Representative-1") calling on behalf of Consumer Shield to offer Victim-1 debt relief services.  At the time, Victim-1 was almost 80 years old and had approximately $30,000 in credit card debt.

       b.    Representative-1 told Victim-1, in sum and substance, that Consumer Shield could eliminate Victim-1's debt within 6 months to a year for a fee.

       c.    In or about February 2017, Victim-1 agreed and paid approximately $23,000 via check, which Victim-1 mailed to Empire. Victim-1 understood that these funds were being placed in an escrow account and that once Victim-1's debt was settled, Victim-1 would receive a refund of the $23,000 payment.

       d.    Victim-1 attempted to contact Consumer Shield several times without success and was ultimately sued by Victim-1's credit card company.

       e.    In or about June 2017, Victim-1 was able to reach a second representative ("Representative-2") at Consumer Shield.  During that conversation, Victim-1 was told that Victim-1's $23,000 had been stolen and that, in exchange for Victim-1 not reporting Consumer Shield to law enforcement, Victim-1 would be refunded the $23,000.

---

[5]    On or about March 21, 2017, CW-1 was arrested and the New Jersey Olive Branch office searched.  As of the date of CW-1's arrest, CW-1 ceased to operate Consumer Shield, but understood that SAGER was continuing to communicate with Victims of the Debt Relief Scheme regarding their debt.

           f.    Victim-1 subsequently received, via mail, two checks totaling $1,500 and was never refunded the remainder of Victim-1's $23,000 payment.

           10.   Based on my interview of another Victim ("Victim-2"), and my review of documents provided by Victim-2, I have learned, in substance and in part, the following:

           a.    Victim-2, then living in the state of Ohio, was contacted by a representative ("Representative-3") of Consumer Shield in or around September 2016 regarding a purported consolidation of Victim-2's debt, i.e., regarding the Debt Relief Scheme.

           b.    At the time, Victim-2 was approximately 70 years old and had significant credit card debt after investing in, among other things, the Business Opportunity Scheme and the Grant Scheme.

           c.    Victim-2 did not have sufficient cash to pay the fee solicited by Representative-3 in furtherance of the Debt Relief Scheme, so Representative-3 asked Victim-2 to charge the fee to a personal credit card.  Victim-2 authorized a credit card charge of $6,800 payable to Tax Pilot and signed a contract with Tax Pilot.[6]

           d.    When Victim-2 did not receive the debt consolidation services promised by Representative-3, Victim-2 contacted Tax Pilot and asked for a refund.  Victim-2's request was denied, and Victim-2 has never received a return of any funds obtained from Victim-2 in the course of the Debt Relief Scheme.

           11.   Based on my interview of another Victim ("Victim-3"), my review of documents provided by Victim-3, I have learned, in substance and in part, the following:

---

[6]     Based upon my review of this and other Tax Pilot contracts in the course of this investigation, I know that the Tax Pilot contracts indicate that Tax Pilot is located at 315 Madison Ave., in New York, New York (the "Manhattan Virtual Office"). In addition, the contracts direct Victims to send written correspondence to the Manhattan Virtual Office.

a.    Victim-3 was contacted by a representative ("Representative-4") from Consumer Shield in or around June 2016 regarding consolidating Victim-3's debt.

b.    At the time, Victim-3 was approximately 70 years old and had approximately $100,000 in credit card debt after investing in, among other things, the Business Opportunity Scheme.

c.    Representative-4 told Victim-3 that if Victim-3 paid Consumer Shield, Victim-3's debt would be "taken down to almost nothing." Victim-3 agreed and sent Empire a check for $9,895.

d.    Victim-3 complained to Consumer Shield in early 2017 that none of Victim-3's debt had been eliminated. Victim-3 was told by a representative of Consumer Shield in approximately June 2017 that one of Victim-3's credit card balances "had been erased" and Victim-3 needed to pay Empire additional money so that Victim-3's credit card companies did not get Victim-3's money.

e.    Victim-3 agreed and sent Empire a check for $7,000 on or about April 24, 2017. Victim-3 was told at the time that the $7,000 belonged to Victim-3 and Victim-3 would get it back. Victim-3 never received the return of Victim-3's $7,000 and Victim-3's debt was never eliminated.

## Sager Controlled the Telemarketing Companies Operating the Debt Relief Scheme

12.    Based upon my participation in this investigation and my conversations with CW-1 and CW-2, I know that SAGER controls Tax Pilot and Empire, the two companies that control the Debt Relief Scheme and receive all Victim payments as part of the Debt Relief Scheme.

13.    Based upon my review of records obtained from Bank of America and from the State of Florida, I have learned, among other things, the following:

a.    JASON SAGER, the defendant, is listed with the State of Florida as the registered agent for both Empire and Tax Pilot.

b.    SAGER is the sole signatory and President listed on four Bank of America accounts in the name of Empire

Tax and Accounting, that is, Bank of America accounts ending in
-9538, -9606, -9619, and -7815.

14.   Based upon my review of reports prepared by other
HSI agents, I learned that on or about February 11, 2018, JASON
SAGER, the defendant, was interviewed at Fort Lauderdale
International Airport upon reentry to the United States from
Panama City, Panama.   During SAGER's interview by a Customs and
Border Patrol Officer with U.S. Customs and Border Protection
("CBP"), SAGER told CBP that he worked for Empire Tax and
Accounting and that he was returning from Panama, where he had
been for a work conference.

15.   Based upon my participation in this
investigation, and my review of a services agreement between a
Manhattan-based virtual office company (the "Virtual Office
Company"), I have learned, among other things, the following:

a.   On or about November 25, 2015, JASON SAGER,
the defendant, entered into a services agreement (the
"Agreement") pursuant to which Tax Pilot would maintain a
mailbox at the Manhattan Virtual Office.   The Agreement lists
"Jason Sager" as the contact for Tax Pilot, and lists SAGER's
personal credit card as the card for payment for the mailbox.

b.   The address of the Manhattan Virtual Office
is the address listed on several documents created by Tax Pilot,
including the contract sent to Victim-2, see supra ¶ 10(b).

16.   Based upon my review of records obtained from
Bank of America related to Tax Pilot, I have learned, among
other things, the following:

a.   A co-conspirator not charged herein ("CC-2")
is listed as the President and sole signatory on a Bank of
America account in the name of Tax Pilot, ending in -2541 (the
"Tax Pilot Account").

b.   For the period between approximately July
2016 and January 2017, approximately $700,000 was withdrawn from
the Tax Pilot Account via wire transfer or check.

c.   During that period, the Tax Pilot Account
sent approximately $264,000 in wire transfers to an account in
the name of WOM, an entity controlled by SAGER.

        d.     During that period, the Tax Pilot Account sent approximately $199,000 in wire transfers to Empire, an entity controlled by SAGER.

        e.     The Tax Pilot Account sent only approximately $9,000 via wire to CC-2.

        f.     Based on the foregoing, it appears that the Tax Pilot account is set up as an intermediary account to funnel proceeds of the Debt Relief Scheme to SAGER.

        WHEREFORE, deponent prays that an arrest warrant be issued for JASON SAGER, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

CHRISTOPHER BASTOS
Detective, Task Force Office
New York City Police Department/
Department of Homeland Security –
Homeland Security Investigations

Sworn to before me this
1st day of March, 2019

THE HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

11